IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04cv231

BLIS DAY SPA, LLC, a North      )
Carolina Limited Liability Company )
& TAMI M. CURTIN,               )
  Plaintiffs,               )
                                )
vs.                             )       MEMORANDUM AND ORDER
                                )
THE HARTFORD INSURANCE          )
GROUP,                          )
  Defendant.                )
_____)


  In this civil action for monetary relief, Plaintiffs Blis Day Spa and Tami M. Curtin assert

claims under North Carolina law for breach of contract; insurance bad faith, violation of the

Unfair and Deceptive Trade Practices Act; and punitive and consequential damages against

Defendant The Hartford Insurance Group for its failure to pay the claimed amount allegedly due

Plaintiffs under its business insurance policy.  Plaintiffs filed their action in the Superior Court

of Mecklenberg County, North Carolina on April 8, 2004.  The Defendant removed the action to

this Court on May 12, 2004.  Jurisdiction is present under 28 U.S.C. § 1332.

  Presently before the Court is Defendant's motion for summary judgment.  Because the

Court concludes that Plaintiffs have offered evidence of damages with reasonable certainty, it

will deny Defendant's motion as to the breach of contract claims.  However, because the Court

finds that Plaintiffs have not offered evidence Hartford ever recognized as valid Blis's claims

under the business insurance policy, but nevertheless refused to pay, and that such refusal was in

bad faith with intent to cause further damage to Plaintiffs; or that Plaintiffs suffered damage as a

result of the alleged conduct, the Court will grant Defendant's motion as to Plaintiffs' insurance

bad faith, UDTPA, and punitive damage claims.  And, as the record reflects no evidence that at

1

the time they contracted the parties contemplated, or reasonably could be supposed to have contemplated, consequential damages of the kind and character sought here in the event of a breach of the Business Policy, the Court will grant summary judgment as to those claims. Finally, the Court finds the parties intended that Tami Curtin would be a beneficiary of the Business Policy, and therefore it will deny Defendant's motion for summary judgment on that claim.

From the parties' proposed findings of fact and the record, the Court finds the following facts to be material and undisputed.

## FACTS

Tami Curtin owns Blis Day Spa, L.L.C., which began operating in May 2002, at its premises located on 136 Main Street, Pineville, North Carolina. Curtin also is the sole owner of TMC Holdings, L.L.C., which owns the premises where Blis operates. In May, 2002, Hartford issued Blis Spectrum Insurance Policy 22SBABA7711, covering damage to business personal property, business income loss, and extra expenses (the "Business Policy"), and issued TMC and Curtin Spectrum Insurance Policy 22 SBA BA 7728, covering rent loss and physical damage to Blis's premises (the "Building Policy").

On January 1, 2003, a fire destroyed much of Blis Day Spa, rendering the premise untenable. In order to resume operations, Blis moved into a temporary facility located two blocks away from the original site, and spent $64,000 on an advertising campaign in order to maintain its customer base.

The day following the fire, Hartford's claims representative Michael Zondroy made the first of several advances in anticipation of business interruption and/or extra expense costs. And within three weeks Hartford had advanced $100,000 in anticipated losses under the Business

Policy, without reports or a proof of claim. In late January, 2005 Hartford retained independent forensic accountant Gary Johnson, who began requesting financial information to calculate Blis's interim business loss, and asked Blis and Curtin to prepare a claim presentation for his review. In response, Plaintiffs' adjuster, Jim Twadell, submitted a claim approximating losses of $50,000-75,000 for the agreed upon six-month period of business interruption.

Throughout the period of interruption Hartford made a series of payments under both policies totaling $632,878.50 even though Blis had submitted financial information for only $150,939.55 of its total claim, including an interim extra expense claim for $100,709.55, and interim business interruption loss calculations of $50,230.00. Hartford's payments under the Business Policy included $100,000 for extra expenses/business income advances; $150,000, the policy's limit, for Business Personal Property advances; and $40,185.26 for payments pursuant to Blis's Stretch Coverage. And its payments under the Building policy included $284,585.52 related to damages to Blis's premises; $26,000 for rent losses; and $38,107.72 related to trade fixtures. The trade fixtures usually would have been covered under the Business Personal Property policy; however coverage under Blis's business personal property policy previously had been exhausted.

In July, Blis replaced its previous adjuster with its CPA, Jack Heil, who originally had been retained to correct Blis's accounting system. On August 4, 2003, Heil provided Hartford a summary of Blis's claimed expenses. He calculated a claim of $315,060.00, including a business interruption loss analysis totaling $206,375.99, and $108,684.00 in "necessary" extra expenses including $64,000 advertising costs. Hartford found this amount excessive for two main reasons. First, the claim for business interruption loss was three times the amount

previously calculated by Blis's adjuster. Second, Blis had spent only $22,279.92 on advertising during its ten-month start-up period.

On August 8, 2003, after the parties met to attempt to resolve the claim, Hartford issued a check in the amount of $36,738 for business interruption losses associated with spa services, nail services, and gift certificates. The parties did not agree as to a valuation for losses associated with hair services and hair products, as well as other extra expenses.

On September 18, 2003, after another meeting, Hartford issued a $59,710.0 check for Blis's remaining business interruption loss relating to hair services and hair products. Approximately a month later, Hartford issued a $26,048.47 check for extra expenses incurred by Blis as a result of the fire, and a $30,000 check for the uncontested amounts of advertising expenses incurred by Blis.

As of December 2003, payments from Hartford to Blis totaled $785,374.97, including $442,681.72 under the Business Policy. According to Blis's accountant Jack Heil, Hartford still owed $162,504, including $109,928 in business interruption losses, $34,000 in advertising expenses, and $18,576 in undefined extra expenses. On February 10, 2004 Hartford informed Plaintiffs that it was invoking the appraisal provision in the Business Policy. Plaintiffs opted not to proceed to appraisal, however, and filed the instant suit.

STANDARD OF REVIEW

To prevail on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); accord Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party

must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.' " Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir.1995) (quoting Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir. 1990). The opposing party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine issue for trial. Celotex, 477 U.S. at 324 Mere disagreement with the movant's asserted facts is inadequate if not supported by the record.

## A. Breach of Contract

Plaintiffs Curtin and Blis assert that Hartford violated the terms of the Business Policy when it failed to pay $162,504 in damages, including $109,928 for business interruption loss; and $52,576 in extra expenses, $34,000 of which relates to advertising costs and $18,576 of which relates to other, undefined, extra expenses.

### 1. Damages for Business Interruption Loss

While the proper amount of damages is generally a question of fact, the proper standard with which to measure those damages is a question of law. Olivetti Corp. v. Ames Bus. Sys., Inc., 319 N.C. 534, 548, 356 S.E.2d 578, 586 (1987). In order to recover damages for lost profits, a complainant must prove that, absent the breach of contract, profits would have been realized in an amount provable with "reasonable certainty." Damages for "lost profit damages cannot be based upon "hypothetical or speculative forecasts of losses." Iron Steamer, Ltd. v. Trinity Restaurant, Inc., 110 N.C.App. 843, 847-48, 431 S.E.2d 767, 770 (1993) (citation omitted); see also Catoe v. Helms Constr., & Concrete Co., 91 N.C.App. 492, 496, 372 S.E.2d

331, 335 (1984) (testimony providing an estimate of anticipated profits is not enough of a factual basis for the issue to reach a jury).  However, while evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion, "absolute certainty is not required."  Perfecting Service Co. v. Product Development & Sales Co., 259 N.C. 400, 417, 131 S.E.2d 9, 22 (1963); see also Keith v. Day, 81 N.C.App. 185, 196 343 S.E.2d 562, 569 (1986) ("the indefiniteness consequent upon this difficulty does not, however, by itself preclude relief. . . . What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages").  There is no bright-line rule in determining what amount of evidence is sufficient to establish lost profits.  Rather, courts "have chosen to evaluate the quality of evidence of lost profits on an individual case-by-case basis in light of certain criteria to determine whether damages have been proven with 'reasonable certainty.' "  Iron Steamer, 110 N.C.App. at 847-48, 431 S.E.2d at 770.

The general rule requiring "reasonable certainty" has been applied specifically to lost profit damages for new businesses without a history of profitability.  See Olivetti, Iron Steamer; see also McNamara v. Wilmington Mall Realty Corp., 121 N.C.App. 400, 466 S.E.2d 324 (1996).  In Iron Steamer, the North Carolina Court of Appeals addressed the difficulty in calculating damages for lost profits in the context of a breach of lease where the lessee's business was an un-established resort restaurant.  The court held that the expert's opinion did not support a claim for damages when that opinion was based solely on the claimant's own speculative business plan, and not based on any independent research, data or any comparison to similar businesses.  Specifically, the court held:

> the relationship between lost profits and the income needed to generate such lost profits peculiarly sensitive to certain variables. . . . Therefore, proof of lost profits with reasonable certainty under these circumstances requires more specific

6

> evidence and thus a higher burden of proof. While difficult to determine, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analysis, and business records of similar enterprises.

110 N.C.App. at 849, 431 S.E.2d at 771 (quoting 22 Am.Jur.2d Damages § 627 (1988)).

Likewise, the court in <u>McNamara v. Wilmington Mall Realty Corp.</u>, also in the context of breach of lease, held that an expert's assumption the plaintiff's sales would rise to meet the average sales of independent national jewelers, without any comparison to local jewelers, was too conjectural and speculative too support the award of lost profits. 121 N.C.App. 400, 466 S.E.2d 324, 329-32 (1996); <u>see</u> <u>also</u> <u>Weyerhaeuser Co. v. Supply Co.</u>, 292 N.C. 557, 561, 234 S.E.2d 605, 607 (1977) (where plaintiff's business suffered a net loss in its first year, evidence that the budget had projected a profit of $80,000 for that year provided no basis for an award of lost profits since any estimate of plaintiff's expected profits was based solely on speculation).

Hartford contends that Blis's estimates of lost profits as a matter of law are unduly speculative and therefore it is entitled to summary judgment because there is no competent evidence of additional business interruption losses. Specifically, Hartford points to the fact that: 1) Heil's calculations assume that Blis would have increased its number of revenue producing hairdressers to sixty-six during the period of interruption when in fact there were only fifty-six hairdressers; and 2) Heil's assumed revenue generated by each hairdresser, $6,134, derived from the industry average, grossly overstates the actual revenue generated before, during, and after the period of interruption. In response, Plaintiffs argue Heil has provided ample support and explanation for his methodology, figures, and assumptions employed in reaching his estimates. Heil first examined Blis's financial documentation and its business plan, and interviewed Blis's management and its supplier, Jim Barr. He then utilized the following factors to calculate

anticipated monthly business income: maximum available hours of service operation, the most used hourly service rate, available service providers, operational realization percentage, and Blis's historical trends, including what he considered its upward trend towards profitability. Heil determined the maximum available hours of operation, and multiplied that by the "most used hourly service rate" of $71. Heil then multiplied this number by the anticipated number of service providers, based on the space available, for the six-month period of interruption. He then applied to that number a "realization number" of 40-55%, a number derived by starting from the "industry" figure of 70%, the assumed maximum efficiency rate for hairdressers, and then adjusting downward.

Having examined the record, the Court cannot conclude as a matter of law that Heil's estimate are unduly speculative or that the Plaintiffs have not provided business interruption losses with enough certainty for a jury to fact finder to render a judgment in that amount. Accordingly, Defendant's motion for summary judgment is denied as Plaintiffs' claims relating to business interruption losses under the Business Policy.

2. Extra Expenses

When construing an insurance contract, the objective of the Court is to determine the intent of the parties at the time the Business Policy was issued. Woods v. Nationwide Mutual Insurance Company, 295 N.C. 500, 246 S.E.2d 773 (1978). To determine that intent, the policy is to be construed as a whole, with the various terms construed harmoniously so that, if reasonably possible, every word or provision will be given effect. Stanback v. Winston Mutual Life Insurance Company, 220 N.C. 494, 17 S.E.2d 666 (1941). Although ambiguous phrases are construed against the insurer, there is no ambiguity "unless, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for

which the parties contend." Wachovia Bank & Trust Company v. Westchester Fire Insurance Company, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970). Where the ambiguity creates a genuine issue of material fact regarding the parties' intent, it is necessary to proceed to trial. General Accident Fire and Life Assurance Corporation Limited v. Akzona, Inc., 622 F.2d 90 (4th Cir. 1980).

Hartford contends that it is entitled to summary judgment on Plaintiffs' claim for extra expenses related to advertising costs on the grounds that as a matter of law it has paid all amounts owed under the Business Policy. Specifically Hartford claims because Blis spent $22,279.92 on advertising over the ten-month start-up period, the disputed amount ($34,000 out of $64,000 claimed) in advertising costs related to a radio campaign was not "necessary" within the meaning of the policy.[1] Hartford points out that, although Curtin was informed that Hartford need to pre-approve business expenses, she did not submit a report until after most of the cost of advertising had been paid. In response, Plaintiffs contend that the two circumstances were very different. During the start-up phase, Curtin "was able to plan the advertising expenditures and thereby take advantage of the lower radio and print media costs." However, after the fire, Curtin needed to conduct a radio campaign on short-notice to maintain her current customer base. Therefore, the additional expenses were reasonable because the short notice meant she was unable to take advantage of the reduced advertising costs during Blis's previous advertising campaign.

The Court finds that the Business Policy does not define the word 'necessary' and thus the phrase is ambiguous. Because either party's interpretation may be permissible in light of

[1] The Policy provides in pertinent part "We will provide necessary Extra Expenses you incur during "the period of restoration" that you would not have incurred if there had been no direct physical loss or damage to the described premises . . . . Extra expenses means expenses incurred: (1) To avoid or minimize the suspension of business and to continue 'operations'. . . ."

both a technical reading of the policy and the actions of the parties, it is the not the duty of the Court to decide whether Blis's advertising expenses were "necessary." See Cram v. Sun Insurance Office, Ltd., 375 F.2d 670, 673-74 (4th Cir. 1967). Therefore, as there is a material issue of fact, the Court will deny Defendant's motion for summary judgment as to Plaintiffs' claims relating to extra expenses under the Business Policy.

## B. Insurance Bad Faith

Plaintiffs contend that Hartford's refusal to pay certain claims after having paid others proves that Hartford determined that the claims were valid, but nevertheless refused to pay. Plaintiffs submit the affidavit of its CPA Jack Heil who identifies a number of acts allegedly establishing bad faith and aggravating conduct.

To prevail on a claim of bad faith in the insurance context, a complainant must establish that there was: 1) a refusal to pay after recognition of a valid claim; 2) "bad faith"; and 3) "aggravating or outrageous conduct." Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd.,11 Fed.Appx. 225, 237, 2001 WL 565317 (4th Cir. May 25, 2001) (unpublished) (citing Lovell v. Nationwide Mut. Ins. Co., 108 N.C.App. 416, 424 S.E.2d 181, 184 (N.C.App.1993)). " 'Bad faith' means not based on a legitimate, 'honest disagreement' as to the validity of the claim. 'Aggravated conduct' is defined to include fraud, malice, gross negligence, insult . . . willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." Id. (citing Dailey v. Integon Gen. Ins. Corp., 331 S.E.2d at 148); see also Newton v. Standard Fire. Ins. Co., 291 N.C. 105, 229 S.E.2d 297 (1976).

The Court finds that the present case is analogous to Topsail. There, a dispute arose after the insurer refused to pay plaintiffs total claim of loss arising under a policy insuring plaintiff's

condominiums for damages caused by hurricanes. Following Hurricane Bertha, the plaintiff submitted a proof of loss to the insurer for two million dollars, which the insurer agreed to pay in full. While repairs were in progress, the condominiums were damaged as a result of Hurricane Fran. Both parties retained adjusters to prepare estimates of the total damage sustained as a result of the hurricane. Ultimately, the insurer disputed the claims submitted by the plaintiff on grounds that the estimates were not properly reconciled, the summaries included non-hurricane related damage, documentation for damages had not been provided, unreasonable prices had been submitted, and the summaries contained duplications between the two hurricanes. The Fourth Circuit agreed with the insurer, finding that the insured had failed to produced sufficient evidence that insurer ever recognized the submitted claim summaries as valid. The court found that insured's evidence showed that insurer "deemed plaintiff's claim figures to be excessive and therefore not valid." Topsail, 11 Fed. Appx. at 238. The court further noted that "when an insurer denies a claim because of a legitimate, 'honest disagreement' as to the validity of the claim, the insurer is entitled to judgment as a matter of law because the plaintiff cannot establish bad faith or any tortious conduct on the part of the insurer." Id. at 239. The court also held that "[s]ummary judgment is appropriate in favor of the insurer on a bad faith refusal to settle claim when [a] coverage issue [is] reasonably in dispute." Id. (citing Olive v. Great American Ins. Co., 76 N.C. App. 180, 333 S.E.2d 41 (1985)).

Hartford contends that Plaintiffs have not offered evidence that Hartford ever recognized Blis's claims under the Business Policy as valid, but nevertheless refused to pay and that such refusal was in bad faith with intent to cause further damage to Plaintiffs. In response, Plaintiffs contend that Hartford's refusal to pay certain claims after having paid others establishes a material dispute of fact as to whether Hartford determined that the claims were valid, but

nevertheless refused to pay. Plaintiffs submit the affidavit of its expert and CPA Jack Heil who identifies a number of acts allegedly establishing bad faith and aggravating conduct is sufficient to create a material dispute of fact. The Court disagrees.

First, having reviewed the record, the Court finds there is no evidence that Hartford ever recognized as valid the disputed portions of the Plaintiffs' business interruption and advertising expenses claims. Plaintiffs' lone argument, that because Hartford paid $36,738.00 for lost income relating to spa, nail and gift certificates it therefore must accept as valid Heil's methodology as to all business income losses, is unpersuasive. First, the record reflects that Hartford has paid all undisputed amounts under both policies, which includes $442,681.73 under the Business Policy, and all undisputed amounts related to business income and extra expenses. Second, Blis's original claim for business interruption calculated losses for the six-month period of interruption in an amount between $50,000-75,000; Hartford's own adjusters calculated Blis's losses related to hair and product services at $59,710.00; and Hartford agreed to pay Blis $59,710.00, the undisputed amount of business interruption loss for hair services and hair products, as well as of $36,738.00 for satisfaction of all spa, nail and gift certificate business lost as a result of the fire. Third, the record reflects that Blis did not properly advise Hartford of its marketing plan before incurring $64,000; Plaintiffs were aware that Zondory anticipated that Blis's advertising costs range from $25,000.00 to $27,000.00, approximately the costs incurred during Blis's first months of operation; and Hartford issued a check in the amount of $30,000.00 to Blis for undisputed amount of advertising costs. None of this suggests that Hartford ever recognized the claimed amounts as valid, but nevertheless failed to pay.

Likewise, while Plaintiffs allege a number of acts which allegedly establish bad faith,[2] the Court finds Plaintiffs have fail to demonstrate that Hartford's refusal to pay the claim was not because of a legitimate, "honest disagreement" as to the validity of the claim or innocent mistake.  See Olive v. Great American Ins. Co., 76 N.C.App. 180, 333 S.E.2d 41 (N.C.App. 1985) (when an insurer denies a claim because of a legitimate, "honest disagreement" as to the validity of the claim, the insurer is entitled to judgment as a matter of law because the plaintiff cannot establish bad faith or any tortious conduct on the part of the insurer).[3]  Nor have they identified any aggravating conduct.

The bulk of Plaintiffs' evidence of bad faith and aggravating conduct is found in Jack Heil's affidavit.  Plaintiffs contend that the forecast of his testimony is sufficient to create a genuine issue as to material fact.  However, in reviewing the affidavit, the Court finds that much of the information is mere conclusory statements of Heil's ultimate opinions, and does not "reveal a process of reasoning beginning with a firm foundation."  Mid-State Fertilizer v. Exchange Nat. Bank, 877 F.2d 1333, 1338-39 (7th Cir. 1989).  Such information is insufficient to create a genuine issue of material fact for summary judgment purposes.  See Bouchat v. Balt. Ravens Football Club, 346 F.3d 514, 526 (4th Cir. 2003);  LINC Fin. Corp. v. Onwuteaka, 129 F.3d 917, 920 (7th Cir. 1997) ("The object of Rule 56(e) is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit").  Certainly, Heil's affidavit, and the reports incorporated by reference, contains a thorough description of Blis's business income losses, as well as his general conclusions that the instant dispute is not merely an honest

---

[2]The alleged behavior essentially is a recitation of Section 58-63-15(11) of the North Carolina General Statutes: "Unfair or deceptive acts or practices in the settlements of insurance claims."
[3]Indeed, Plaintiffs apparently concede that the dispute is one over methodologies, when they state in their reply brief that "as to the lost business income during the period of interruption, the certified public accountants for each side simply could not agree as to the correct methodology for calculating the loss amount of on the total loss amount itself." (Plaintiffs' Response, p. 5).

disagreement or based on an innocent mistake. However, the affidavit does not back up the general conclusions with any specific evidence that the instant dispute is the product of a "grossly inadequate investigation or a willful intent to deceive" or that Johnson's analysis "fall[s] well below the professional standards" required of a CPA, such that there is an "absence of 'honest disagreement' or innocent mistake in [the] matter." Furthermore, Heil's specific factual assertions, that Hartford did not pay advances for extra expenses, and that Johnson "misrepresented" the amount of hair service providers, by failing to included part-time hairdressers fail to establish bad faith. First, although Heil alleges that Hartford did not pay advances for extra expenses, the record clearly reflects that Hartford did pay such advances. Second, because any alleged misrepresentation did not change the methodology Johnson used to calculate Blis's business income or the amount ultimately due Plaintiffs, there is no evidence that the Plaintiffs suffered any damages due to Johnson's alleged misrepresentation. Pearce v. American Defender Life Ins. Co., 316 N.C. 461, 471 343 S.E.2d 174, 180 (1986) (citing Ellis v. Smith-Broadhurst, Inc., 48 N.C.App. 180, 268 S.E.2d 271 (1980)).

Heil's affidavit likewise addresses in a conclusory fashion Hartford's alleged aggravated conduct (i.e., "Hartford and Johnson were in possession of critical financial information regarding the negative impact that their mismanagement of their insurance claims had on Blis's operations"). That Hartford failed to pay the disputed amounts when it allegedly was aware that Blis was financially bereft is insufficient to establish aggravating conduct.

## C. Plaintiffs' UDTPA claims

Plaintiffs identify certain types of conduct prohibited under Section 58-63-15(11) to argue that Hartford violated the UDTPA.[4] Specifically, Plaintiffs allege that Hartford: 1)

---

[4]Section 58-63-15(11) of the North Carolina General Statutes defines unfair methods of competition and unfair or deceptive acts or practices in the settlements of insurance claims. As a

without a valid basis refused to pay Blis's claims related to lost business income and related extra expenses, and did not promptly make an advances, as required by the Business Policy; 2) failed to conduct a "proper and sufficient" investigation; 3) misrepresented certain policy provisions relating to the loss of business income and related expenses at issue; and 4) refused to settle in order to exert financial pressure upon Blis. As discussed below, the Court finds that the evidence with respect to each of Plaintiffs allegations does not support a finding that Hartford's actions in negotiating the payment of claims were in any way "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Gray v. North Carolina Ins. Underwriting Ass'n 352 N.C. 61, 68, 529 S.E.2d 676, 681 (N.C. 2000). Therefore, the Court will grant summary judgment as to Plaintiffs' UDTPA claims.

To establish a claim under the UDTPA, N.C.Gen.Stat. § 75- 1.1(a), a complainant must show: 1) an unfair or deceptive act or practice, 2) in or affecting commerce 3) which proximately caused injury to plaintiffs. See First Atl. Mgmt. Corp. v. Dunlea Realty Co., 131 N.C.App. 242, 507 S.E.2d 56, 63 (N.C.App. 1998). The determination of whether an act or practice is an unfair or deceptive practice is a question of law for the court. See Ellis v. Northern Star Co., 326 N.C. 219, 388 S.E.2d 127, 131 (N.C. 1990). A practice is unfair and deceptive "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). Moreover, "where a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice."

---

matter of law, when an insurer engages in any practice or act specifically prohibited under Section 58-63-15(11), it "also" engages in conduct that embodies the broader standards of N.C.G.S. § 75-1.1." Gray, 352 N.C. at 68.

<u>Gray v. North Carolina Ins. Underwriting Ass'n</u>, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000) (citing <u>Johnson v. First Un. Corp</u>., 128 N.C.App. 450, 458, 496 S.E.2d 1, 6 (1998)).


1.  Denial of Claim

The North Carolina Supreme Court has held that an insurance company violates the UDTPA by not "attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." <u>Gray</u>, 352 N.C. 61, 529 S.E.2d 676 (quoting N.C.Gen.Stat. § 58-63-15(11)(f)).  In <u>Gray</u>, the insurer's claim adjuster estimated the amount of damage caused to the insured property.  While these estimates later were corroborated in large part, the insurer refused to pay the claim. Under these facts, the North Carolina Supreme Court held that liability was clear and that the insurer acted in bad faith by "arbitrarily" refusing to pay the claim based upon its claim adjuster's estimates.  However, in the present case, Plaintiffs have not presented evidence either that Hartford ever recognized the validity of its estimates, or that its failure is not the product of an honest disagreement or honest mistake. Rather, Hartford has paid all undisputed amounts, and has communicated to Blis the grounds for its disagreement concerning disputed claims whereas in <u>Gray</u>, the insurer "arbitrarily" selected an estimate that was substantially less than what its adjuster recommended and refused to pay anything on the claim unless the policy holder accepted the lesser offer as a full settlement of its claim under the policy.

2.  Misrepresentation of Claim

Plaintiffs contend Zondry misrepresented to Curtin the meaning of "business interruption" under Hartford's policy. Specifically, Plaintiffs allege that in June, 2003, Zondry

stated that "the period of interruption is going to be to the end of April . . . [t]he period of interruption ends the date that you take possession of the building."  Plaintiffs also contend that Johnson's initial estimates misrepresented the total number of hairdressers working at Blis. Hartford argues that such statements, if incorrect, were the result of a reasonable misunderstanding of Blis's operational status, and were not intentionally deceitful.  Hartford further argues that there is no evidence the Plaintiffs were damaged by these statements.

The Court notes that, according to North Carolina law, a *negligent* misrepresentation as to a policy term is sufficient to establish an UDTPA claim, and good faith or ignorance of falsity is not a defense to an action under § 75-1.1.  <u>Forbes v. Par Ten Group, Inc.</u>, 99 N.C.App. 587, 394 S.E.2d 643, 651 (N.C.App.1990) ("[t]hat defendants may have made these misrepresentations negligently and in good faith, in ignorance of their falsity, and without intent to mislead, affords no defense to an action under [the UDTPA]").  Furthermore, "even a truthful statement may be deceptive if it has the capacity or tendency to deceive."  <u>Pearce v. American Defender Life Ins. Co.</u>, 316 N.C. 461, 343 S.E.2d 174, 180 (1986).  Any negligence by Plaintiffs in failing to correct Zondry or Johnson would irrelevant in an action under the UDTPA. <u>Winston Realty Co., Inc. v. G.H.G., Inc.</u>, 314 N.C. 90, 331 S.E.2d 677, 680-81 (N.C. 1985). However, to the extent that any statements by Zondry or Johnson were incorrect, that statement is insufficient to ground an UDTPA claim against Hartford because there is no evidence that the Plaintiffs were damaged by this misleading statement.  <u>See</u>, <u>e.g.</u>, <u>Burgess v. Busby</u>, 544 S.E.2d 4, 11 (N.C.App. 2001) (noting that, to establish a prima facie UDTPA claim, the plaintiff must show that the act or practice "proximately caused actual injury to them").  No evidence exists indicating that Hartford ever delayed payments or that Plaintiffs suffered any damage as a result of either statement.

### 3. Failure to Settle

An insured does not have a duty to settle an insured's claim. Rather, the insurer only has a duty to consider settlement of the claim in good faith. Section 58-63-15(11)(g) only prohibits an insurer from compelling an insured to institute litigation to recover amounts due under a policy. Plaintiffs point to no evidence demonstrating that Hartford believed the claim to be valid but disputed it for the purpose of forcing Blis to settle for less than what was owed under the Business Policy other than that Hartford failed to pay the disputed claims when it allegedly was aware that Blis was financially bereft. Nor do Plaintiffs dispute that Hartford has paid approximately $750,000 under both policies. Furthermore, once it was clear that the parties could not resolve their dispute, Hartford attempted to invoke the appraisal provision, an option equally available to Blis. Blis, however, chose not to proceed to appraisal, and instead filed the instant suit.

### 4. Failure to Investigate

Finally, the Plaintiffs contend that Hartford failed to properly investigate. They do not, however, identify any specific failures or how those alleged failures damaged the Plaintiffs. Therefore, the Court will deny Plaintiffs' claims on those grounds.

### D. Punitive Damages

In North Carolina, punitive or exemplary damages are not allowed for breach of contract. Where there is an identifiable tort which constitutes or accompanies the breach of contract, the tort itself may give rise to a claim for punitive damages if the tortious conduct must be accompanied by or partake of some element of aggravation before punitive damages will be allowed. Aggravated conduct has long been defined to include fraud, malice, gross negligence, insult, willfully, or under circumstances of rudeness or oppression, or in a manner which evinces

a reckless and wanton disregard of the plaintiffs rights.  <u>Baker v. Winslow</u>, 184 N.C. 1,5, 113 S.E. 570, 572 (1922).  In order for the Plaintiffs to recover on their claim for punitive damages under North Carolina law, they would have to produce evidence that the Defendant has determined that the claim was valid, but nevertheless refused to pay, and that such refusal was in bad faith with intent to further damage the Plaintiffs.  <u>Michael v. Metropolitan Life Ins. Co.</u>, 631 F.Supp. 451, 455 (W.D.N.C. 1986).  Whether the facts stated in the pleadings are sufficient to bring the case within the rule allowing punitive damages is a question of law, although the determination whether punitive damages will be allowed is a question of fact for the jury.  <u>Worthy v. Knight</u>, 210 N.C. 498, 187 S.E. 771 (1936).

In the present case, Plaintiffs have failed to establish that Hartford committed an identifiable tort which caused harm to Plaintiffs or any element of aggravation.  As discussed <u>supra</u>, Plaintiffs have offered no evidence to establish that Hartford determined Blis's claims were valid or that any refusal by Hartford to pay disputed claims was not due to honest disagreement.  Moreover, Plaintiffs have not alleged fraud in this action and have offered no specific evidence that Hartford has acted maliciously, willfully, rudely, wantonly, or oppressively, other than its failure to pay disputed claims.  Thus, the Court finds as a matter of law the factors necessary for Plaintiffs to recover punitive damages are not present and will grant summary judgment as to their claims for punitive damages.

### E. Third Party Claims

Plaintiffs contend that Curtin is an intended third-party beneficiary under the Business Policy and therefore is entitled to pursue any available claims for bad faith, unfair and deceptive trade practices, or punitive damages.

It is well-settled North Carolina recognizes the right of a third-party beneficiary to sue for breach of a contract executed for his benefit. Vogel v. Supply Co., 277 N.C. 119, 177 S.E.2d 273 (1970). The most significant factor as to the rights of a third-party beneficiary is that *both* contracting parties intended that a third party should receive a benefit that might be enforced in the courts. It is not enough that only one of the parties to the contract and the third party intended that the third party should be a beneficiary. Raritan River Steel Co. v. Cherry, Bekaert & Holland, 329 N.C. 646, 651, 407 S.E.2d 178, 181 (1991) (citing Vogel, 277 N.C. at 128). While the promisee's intent is the primary intent which the Court must examine, the intent of both the parties must be considered. Nor is it sufficient that the contract does benefit a party if in fact it was not intended for that party's benefit. Raritan, 329 N.C. 646, 651. The parties' intentions are discerned from the "circumstances surrounding the transaction as well as the actual language of the contract," which must be "construed strictly against the party seeking enforcement." Chemical Realty Corp. v. Home Fed. Savings & Loan, 84 N.C.App. 27, 34, 351 S.E.2d 786 (1987)). In examining the circumstances surrounding the transaction, the North Carolina Supreme Court in Raritan considered 1) the parties' lack of knowledge that the audited financial statements would be provided to a third party; 2) the failure to designate in the contract a third party as an intended beneficiary; and 3) whether audited financial statements were delivered directly to the third party. 329 N.C. at 653-54. However, the court emphasized that the entire record, not any single factor, was dispositive as to the parties' intention. Id. at 654.

Defendant claims that since Curtin is not a named insured under the Business Policy issued to Blis, she is not a direct beneficiary and is not entitled to pursue claims for bad faith, unfair and deceptive trade practices, or punitive damages. This Court disagrees. Having considered the record in the instant case, in particular Tami Curtin's affidavit, the Court finds

that at the time of the contract the parties intended that the contract was made for the benefit of Mrs. Curtin. Therefore, the Court will deny the Defendant's motion for summary judgment as to Curtin's third-party beneficiary claims.

## F. Consequential Damages

Plaintiffs contend that because Hartford allegedly did not provide any business interruption advances during the agreed upon period of interruption, and failed to remit over $160,000 for documented business interruption loss claims, Blis has been operating in insolvency mode and as a result has incurred over $446,000 in consequential damages.[5]

The North Carolina Court of Appeals has not ruled on the specific issue of whether or under what circumstances a policyholder can obtain consequential damages stemming from an insurer's breach of an insurance policy. Where a question of state law is unclear, a federal court must predict how the highest court of the state would decide the question today. In making that prediction, decisions of the lower state courts may be persuasive evidence of state law, but are not binding on the federal court should it be convinced the highest court would rule to the contrary. Sanderson v. Rice, 777 F.2d 902, 903 (4th Cir.1985), cert. denied,475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986). Interests of comity warrant caution on the part of the federal courts in announcing what state law is; federal courts should be wary of expanding the boundaries of established state jurisprudence. Burris Chemical, Inc. v. USX Corp., 10 F.3d 243 (4th Cir. 1993).

---

[5]Damages as of December 22, 2004.

Under North Carolina law, an injured party is entitled to be fully compensated for his loss and to be placed as near as may be in the condition which he would have occupied had the contract not been breached.  Stanback v. Stanback, 297 N.C. 181 (1979).  When an action for breach of contract is brought, the damages recoverable in such an action are those that "naturally flow from the breach, and such special or consequential damages as are reasonably presumed to have been within the contemplation of the parties at the time they made the contract, as the probable result of a breach of it."  Johnson v. Railroad Co., 140 N. C. 574, 577, 53 S. E. 362 (1906).  Whether special damages arising from the breach of a contract may be regarded as "within the contemplation of the parties," and therefore recoverable, would depend upon the information communicated to or the knowledge of the parties at the time and the reasonable foreseeability of such damages.  Stanback, 297 N.C. 181; Troitino v. Goodman, 225 N.C. 406, 35 S.E.2d 277 (1945).[6]  North Carolina courts have often relied on the limitation on recovery of damages as stated in the Restatement of the Law of Contracts:

> Foreseeability of Harm as a Requisite for Recovery. In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury.

297 N.C. at 187 (quoting Restatement of the Law of Contracts, § 330, p. 509).

In order to determine whether at the time of contracting consequential damages were within the contemplation of the parties, courts shall consider whether there existed a specific

---

[6] See also Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 543-544, 23 S.Ct. 754, 755-6 (1903)(what the plaintiff would is entitled to recover "depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed. The consequences must be contemplated at the time of the making of the contract").

provision or language in the policy itself permitting recovery of consequential damages, the nature of the contract itself, or whether such circumstances or conditions as presume special damages were communicated to the defendant.  See, e.g., Johnson, 140 N.C. at 577.

In its motion for summary judgment Defendant asserts that not only is there no provision in the Business Policy making Hartford liable for consequential damages, but the policy specifically excludes from business interruption coverage "any other consequential loss."[7] Hartford also contends that Heil's estimates of consequential damages are too speculative. In light of Defendant's initial showing, the burden shifts to Plaintiffs to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.  Rule 56(e).   Having examined the record, the Court finds that the Plaintiffs have failed to offer sufficient evidence, in the contract or otherwise, that at the time of contracting that the parties contemplated, or that Hartford reasonably warranted, Defendant would be liable for the consequential damages of the kind and character sought here in the event of a breach of the Business Policy.

The Court first notes that Plaintiffs offer no evidence, or even allege, that the parties contemplated at the time of contracting recovery of consequential damages of the type sought in the instant case.

Second, the Court does not find any specific provision or language in the Business Policy itself that would lead either the insured or the insurer to understand that in the event that the

---

[7] 4. Business Income and Extra Expense Exclusions. We will not pay for:
  a. Any Extra Expense, or increase of Business Income loss, caused by or resulting from:
  (1) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or
  (2) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration".
  b. Any other consequential loss.

parties had a reasonable dispute over business expenses Hartford would be liable for loss of future business growth. Plaintiffs do not contend that the Business policy provisions specifically excluding from business interruption coverage consequential losses have no bearing on the availability of consequential damages from an alleged breach. Rather, it appears Plaintiffs tacitly accept that the lost profits that they incurred because of Hartford's failure to pay all dispute amounts under the Business Policy are unambiguously consequential losses within the meaning of the policy. Thus, the Court finds nothing in the Business Policy language would lead Hartford to understand that any delay in payment or disagreement with respect to the claim would render it liable for the consequential damages sought in the instant case.

Third, the Court also finds no evidence from which the parties could presume special. Plaintiffs do not even allege that the parties contemplated at the time of contracting that Plaintiffs would incur additional harm from loss of business in the event Hartford failed to pay disputed sums under the Business Policy. Furthermore, any argument that such consequential damages that result from delay in disputed payments are foreseeable is further forestalled by the appraisal provision,[8] the purpose of which is to avoid precisely the sort of damage caused by a lengthy delay in payment as exists in the instant case.

Finally, because courts are instructed to examine "the nature of the contract itself," the absence of a provision in the contract providing for such damages is not necessarily controlling on the issue of whether damages sought were within the contemplation of the parties. To this end, Plaintiffs contend that "the purpose of the policy is to put the parties in the position they would have been in had no fire occurred. Had the defendant honored its contractual obligations

---

[8] The Appraisal of Property Loss provision provides: "If we or you disagree on the value of the property or the amount of loss, either may make a written demand for an appraisal of the loss...A decision agreed to by any two [of the appraisers and/or umpire] will be binding."

the plaintiffs would have had the cash necessary to continue moving forward with its business operations." The Court finds the Plaintiffs' lone argument is unpersuasive as it rests not on the basis of anything Hartford may be presumed to have known at the time of contracting, but rather merely on the type of insurance that Plaintiffs purchased. As noted in <u>Lava Trading Inc. v. Hartford Fire Ins. Co.</u>,

> [t]he evidence ... simply illustrates the rather unremarkable proposition that business interruption insurance is meant to insure against loss of business income and other expenses, and that if a company does not have such insurance, they stand the risk of financial consequences if they are not otherwise prepared. It is a significant leap of reasoning to conclude from this that Hartford understood that it would be liable for the consequential damages sought here, or was warranting . . . that it would be so liable.

<u>Id.</u> 365 F.Supp.2d 434,446 (S.D.N.Y. 2005).

Having considered the entirety of the Business Policy, the Court concludes that the parties knew that Hartford disclaimed business interruption coverage for consequential losses, and that in the event of a disagreement, either party could seek appraisal. Because the consequential damages that plaintiffs seek were not contemplated as a foreseeable consequence of a breach of Hartford's duty to pay under the Business Policy, the Court need not consider whether Heil's estimates are as a matter of law too speculative.

## CONCLUSION

**THEREFORE, IT IS HEREBY ORDERED** that the motion of Defendant the Hartford Insurance Company is **GRANTED IN PART** and **DENIED IN PART**. The following claims of Plaintiffs Tami M. Curtin and Blis Day Spa are **DISMISSED**:

1.  Plaintiffs' bad faith claims;

2.  Plaintiffs' North Carolina Unfair and Deceptive Trade Practice Act claims;

3.      Plaintiffs' punitive damage claims; and

4.      Plaintiffs' consequential damage claims.

Signed: April 11, 2006

Robert J. Conrad, Jr.
United States District Judge